IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03098-NYW

JOSEPH MALDONADO

    Plaintiff,

v.

CITY AND COUNTY OF DENVER,
COLORADO and EDWARD LEGER,
individually and as Police Lieutenant with
City and County of Denver Police Department,

    Defendants.

**AFFIDAVIT OF JOSEPH MALDONADO**

1.     My name is Joseph Maldonado and I am the plaintiff in this lawsuit.  This affidavit is based on my own personal knowledge.

2.     I am a resident of Broomfield, Colorado, north of Denver.

3.     I am Bible-believing Christian.  My faith compels me to share the gospel of Jesus Christ in public places.

4.     My gospel message focuses on the consequences of sin and the remedy for it.  I explain that we have all sinned, and that the wages of sin are death, but Jesus Christ offers salvation and eternal life as a free gift to any who repent of their sins and follow Him in faith.

Exhibit "A"

5. I hope to reach as many lost souls as I can and want to reach a many people as I can. For this reason, I like to evangelize at public places where I can find a steady stream of people.

6. I share the gospel in several different ways. I usually carry gospel tracts (literature bearing a Christian message) with me to hand out to passersby.

7. I often preach, addressing people nearby with my voice. With preaching, I can reach many people at once over short distances, and it often leads to people noticing me and my message when they otherwise wouldn't.

8. Occasionally, I'll also hold a sign with a Bible verse or some other Christian message.

9. When I get a chance, I like to have friendly conservations with people, one on one or with two people, where I witness about my faith.

10. When I share the gospel, I do not block pathways or get in anyone's way. I stand to the side of wherever I am standing so people can walk by me. And, while I do try to draw attention to my message, I don't draw crowds around me.

11. For that matter, I don't cause any kind of disruption when I evangelize. I don't yell or scream at people. I speak at a moderate volume in a non-threating tone.

12. I want to share the gospel in Red Rocks park, especially on the sidewalks bordering the Upper North lot and Top Circle lot in the park. Attached as Exhibits E, F, G, and H to the Motion for Preliminary Injunction are some photographs I took of the staircase between the Upper North Lot and the Top Circle lot, and the sidewalk leading to it.

13. These sidewalks are well travelled because there are several high-altitude trails and overlooks in the vicinity of these lots. Attached as Exhibit B to the Motion for Preliminary Injunction is a map of Red Rocks Park that illustrates the park's hiking trails and overlooks. Attached as Exhibits I, J, K, and L to the Motion for Preliminary Injunction are some photographs I took of the sidewalk on the southeast side of the Upper North Lot and two of the trails that connect to it. When events are occurring in the Amphitheatre, there are even more people travelling the sidewalks, since a lot of the attendees park in those lots.

14. When events are being held in the Amphitheatre, these sidewalks and parking lots remain free and open to the public. Though most people are going to the event, some just hang out in the area outside the Amphitheatre, take in the views, and sometimes tailgate.

15. Prior to April 2019, I had come to these sidewalks to share the gospel with people on several occasions while events were going on in the Amphitheatre.

16. During my first visit to Red Rocks, I brought a personal voice amplifier with me so people could hear me. Park management told me that amplification was not allowed, and I stopped using it, and they generally left me alone after that.

17. On April 18, 2020, Snoop Dogg was scheduled to have his annual 420 Wellness Retreat concert tour at the Red Rocks Amphitheatre. I knew this concert tour was very popular and would bring a lot of people.

18. I looked forward to sharing the gospel outside this concert. I hoped that I could relate to people attending the Snoop Dogg concert by telling them what Jesus did for me.

19. On the day of the concert, a couple friends of mine, Adam Lacroix and Kerrigan Skelly, and we all went out there together. They came with me to Red Rocks park so we could share the gospel together.

20. We arrived at the park in the late afternoon, around 5:00 p.m. We went to a wide portion of the sidewalk around the Top Circle lot where we could reach people going into the Amphitheater. Attached as Exhibits M, N, and O to the Motion for Preliminary Injunction are some photographs I took of the wide sidewalk bordering the Top Circle Lot, where we went to speak that day.

21. We stood close enough for people to read our signs and hear our voices. I held a small sign proclaiming the need for Jesus Christ.

22. But before I could even say anything to anybody, a park employee walked up to us and said we couldn't be there. He didn't explain why, and it wasn't apparent to me. I had shared the gospel at that same spot several times without issue. I figured he must have been mistaken. I explained to him my understanding that we could be there as long as we didn't block traffic or use amplification and pointed out we weren't doing either of those things.

23. The park employee asked if we were going to leave, and I said we wouldn't leave, since we had every right to be there. He said that was fine, but I sensed he didn't think it was fine, and I told him we would be happy to discuss the issue with the police. I figured the police would tell him that we had a right to be there.

24. After the park official left, I started sharing my testimony with people walking by me, about my life, and how Jesus Christ saved me from drugs and other sinful things that left me empty inside. I assured them that they too could be saved by turning from sin and trusting in Jesus.

25.     I stopped after about 15 minutes, and almost immediately, Lt. Leger with the Denver Police Department approached us, along with the park's event staff manager, Hans Juergens, and a few other police officers.

26.     After greeting us, Lt. Leger said that the Denver City Attorney's office had established public forum areas and that we must leave because we were not in one of those areas.

27.     Lt. Leger's stance surprised me.  No one had ever before told me that this area or any other part of Red Rocks park was off-limits to my speech.  I asked Lt. Leger when they had set aside particular areas for speech, telling him that I had spoken with police in the park before, and had no problems.  Lt. Leger indicated that a change had occurred recently.

28.     Just then, Mr. Juergens walked up and showed me a map of Red Rocks park that had 5 stars on it, explaining that the stars showed the places where we could speak.  Lt. Leger backed him up, stressing that the Denver City attorney said those are the only areas we could speak.

29.     Having been to the park many times in the past, I knew that none of the designated areas would work for my speech.  All of them are thousands of feet from the Amphitheatre and experience little to no foot traffic, so there's no one to hand a tract too, have a conversation with, or hear my preaching.  At most, people driving by in cars might spot my sign, but it's unlikely they'll have time to read it as they drive by.

30.     Three of the spots are on the very edge of the park, in grassy ditches next to highways.  No one has any reason to hand out in these areas long enough to receive my message, they are not particularly attractive areas of the park.  They are just overgrown ditches, where you could find rattlesnakes or other wildlife in the grass.  Attached as Exhibits Q and R to the Motion for Preliminary Injunction are two photographs I took of designated forum area 2 on the western

edge of Red Rocks Park. Attached as Exhibits U and V to the Motion for Preliminary Injunction are two photographs I took of designated forum area 3 on the southern edge of Red Rocks Park. Attached as Exhibits W and X to the Motion for Preliminary Injunction are two photographs I took of designated forum area 4 on the southern edge of Red Rocks Park.

31.     Two of the designated spots are somewhat further in from the edge, but they are not good spots either. One is in a random grassy area in the middle of nowhere. There is no reason for anyone to go there. Attached as Exhibit P to the Motion for Preliminary Injunction is a photograph I took of this spot, designated forum area 1. The other is a spot near the Red Rocks box office, which is equally poor. Pedestrians don't walk through this area. If people come through it at all, they either drive by without stopping or stop in their cars at the box office, receive their ticket, and drive on. And not many people even do that anymore, since most events at the Amphitheatre are sold out through online purchases before the event. Attached as Exhibits S and T to the Motion for Preliminary Injunction are two photographs I took of designated forum area 2a, near the box office.

32.     I was disappointed in what Lt. Leger was telling me. I reminded him that Red Rocks park is a public park, and so, I shouldn't have to leave. Lt. Leger agreed the park is public but he still insisted that we must move due to the City attorney's policy.

33.     At that point, my friend Adam interjected, asking if we could see a written policy to see what is allowed and where we could speak. Mr. Juergens handed him the map and told us the policy is on the park's website. Lt. Leger then asked for Adam's email address and Mr. Juergens emailed Adam a copy of the written policy.

34. I asked Lt. Leger if there were any restrictions on speech within the designated areas, and he said he wasn't sure.

35. Thinking about what was going on, I recalled that the sidewalks where we stood and those bordering the Upper North lot are often used by people who are not going to an event in the Amphitheatre. During events, some people just come to hang out in those places without buying a ticket. And whether an event is occurring or not, people use these sidewalks to go to the trail and sightseeing spots. I made this point to Lt. Leger, but he kept insisting we go to the designated areas to speak.

36. Adam read the policy on his phone and pointed out that the policy seemed to only apply to "facilities" like the Amphitheatre itself, not the entire Red Rocks park, and the sidewalks. But Lt. Leger had heard enough and told us we should take our concerns to the City Attorney. He warned to go to one of the designated areas or we'd get cited and charged with trespass.

37. Kerrigan then spoke up. He took issue with this idea that we could be trespassing on public property.

38. Lt. Leger said he could issue us a ticket if we wanted to argue these things in court. Kerrigan explained that we didn't want a ticket or to argue in court, we wanted to speak in a place where people could hear us and the designated areas didn't offer that. But Lt. Leger reminded that Denver had designated areas for speech and we had to comply with the policy.

39. I was willing to move, but I knew we couldn't find an audience in any of the spots they were forcing us to go. And because we didn't want to get cited or arrested, we gave up and left the park entirely.

40.     I was very discouraged by the result.  I wanted to share the gospel in Red Rocks park, but I knew any attempt to speak in the designated areas would be futile.

41.     Later, Adam forwarded me the policy he received from Mr. Juergens and I looked at it again to see if I could figure out what I could do.  I didn't think they could ban free speech in a public park like that through a policy.  Since the policy indicated that it was last revised in 2008, I wondered whether it was even still in effect, and Lt. Leger and park staff relied on it by mistake.

42.     Later on that summer, I was still bothered about this policy. I pulled it out again and noticed that the bottom of the policy had the logo for "311" which is Denver's telephone help center for city services and information.  So, I called 311, and asked them about the policy and whether it was still binding.  The operator said she didn't know if it was still in effect and suggested I contact the City Attorney's office about the policy.

43.     I asked my wife, Michelle, if she could look up number of City Attorney's office and call them, and she said she could.  In mid-September, she called the City Attorney's office and left a voicemail inquiring about the policy.

44.     A few days later, on September 13, 2019, Marley Bordovsky with the City Attorney's office returned Michelle's call.  She asked Michelle to email a copy of the policy along with our questions about it, and Michelle agreed to do this.

45.     A few days later, on September 16, 2019, Michelle sent the promised email, attaching the policy we received on April 18, and asked whether the policy was law and how Denver could have a policy that violated our First Amendment rights.  Attached as Exhibit Y to the Motion for Preliminary Injunction is a copy of the email Michelle sent that day.

46.     On the next day, Tad Bowman, the Venue Director for Red Rocks Amphitheatre sent an email response to Michelle.  The response didn't answer our questions or explain the policy, but insisted on its validity.  Attached as Exhibit Z to the Motion for Preliminary Injunction is a copy of the email Mr. Bowman sent to Michelle.

47.     When Michelle showed me Mr. Bowman's email, I was discouraged more than ever.  Since Denver refused to relent, I figured I would never be able to speak in Red Rocks park again.

48.     But I later shared my concerns about it with a friend and this friend suggested I seek legal recourse to regain my rights.

49.     I figured this idea was worth a shot.  I retained legal counsel and explained the situation to them.

50.     On June 1, 2020, my counsel sent a letter to Denver officials on my behalf, explaining the incident, pointing out that the policy was unconstitutional, and asking that Denver let me speak in Red Rocks park without being forced into the remote designated areas.  The letter didn't ask for money.  I was only seeking freedom to share the gospel in open areas of Red Rocks park.  Attached as Exhibit AA to the Motion for Preliminary Injunction is a copy of the letter counsel sent on my behalf.

51.     On July 7, 2020, Denver replied to my letter, but refused to provide me relief.  The reply, which included an updated version of the policy, defended the policy and assured that I will never be allowed to speak anywhere in the park except for the 5 designated areas.  Attached as Exhibit BB to the Motion for Preliminary Injunction is a copy of the letter Denver sent in reply to my counsel's letter.  Attached as Exhibit C to the Motion for Preliminary Injunction is Denver's

9

current public forum policy, included in the letter they sent.  Attached as Exhibit D to the Motion for Preliminary Injunction is a map of the designated forum areas, included in the letter they sent.  The locations specified in this map matched the map Mr. Juergens showed me on April 18, 2019.

52.     I want to return to Red Rocks Park and share my faith, but due to the ongoing threat of citation or arrest, I have not done so ever since I was stopped on April 2019.  During that time, I have missed many opportunities to share the gospel.  And until I receive relief, I will continue to miss opportunities to speak in the park.

      I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

                                              s/ Joseph Maldonado  
                                              JOSEPH MALDONADO

STATE OF DENVER

COUNTY OF ADAMS

      On this 13th day of October 2020, before me, a Notary Public of the State and County aforesaid, personally appeared Joseph Maldonado, to me known (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged that he executed the foregoing instrument for the purpose therein contained.

                                              s/ Zhane W. Else  
                                              Notary Public

My Commission Expires: Oct. 29, 2023