IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03098-NYW

JOSEPH MALDONADO

      Plaintiff,

v.

CITY AND COUNTY OF DENVER,
COLORADO and EDWARD LEGER,
individually and as Police Lieutenant with
City and County of Denver Police Department,

      Defendants.

---

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

---

## INTRODUCTION

Plaintiff Joseph Maldonado ("Maldonado") brings this Motion for Preliminary Injunction against named defendants (referred to jointly as "Denver") seeking relief from Denver public forum policy that bars expressive activity on public sidewalks and ways in Red Rocks public park except for a few remote out-of-the-way spots that Denver designates as public forums.

## STATEMENT OF FACTS

### *Maldonado's Religious Speech*

Maldonado wants to share a message about salvation in Jesus Christ with others.  (Verified Complaint [VC], ¶¶ 10-11; Affidavit of Joseph Maldonado, ¶¶ 3-4, attached to Motion for Preliminary Injunction [MPI] as Exhibit [Ex.] "A").  To accomplish this goal, he hands out

1

literature with a Christian message, public orates (preaches), displays signs bearing Scripture and other messaging about his faith, and if given opportunity, partakes in one-on-one or small group conversations. (VC, ¶ 12; Ex. A, ¶¶ 6-9). Circumstances can dictate the specific methods he uses, but he regularly distributes literature, preaches, and/or holds up a sign. (VC, ¶ 13). These activities, conducted either alone or with a friend or two, do not draw crowds or cause congestion. (VC, ¶¶ 14-15; Ex. A, ¶ 10). Maldonado communicates his message in open spaces that leave plenty of room for people to pass by him. (VC, ¶ 15; Ex. A, ¶ 10).

Maldonado goes to public areas, specifically, public parks and sidewalks, to share his faith where he can find a steady stream of people to address. (VC, ¶¶ 17-18; Ex. A, ¶¶ 5, 12). He does not force anyone to listen to him or take literature. (VC, ¶ 16).

### *Red Rocks Park and Amphitheatre*

Red Rocks park is a mountain park owned and maintained by Denver. (VC, ¶¶ 19-20). Covering 868 acres on the eastern slope of the Rocky Mountains, the park boasts of wide-open spaces, rock formations, extensive hiking trails, and various intersecting streets and sidewalks. (VC, ¶¶ 21, 23; *see* Map of Red Rocks Mountain Park, attached to MPI as Ex. "B"). The park also houses a geologically-formed amphitheatre, a visitor center, and a trading post, among other attractions. (VC, ¶¶ 23-24). No fee is required for entry; Red Rocks park is free and open to the public from one hour before sunrise to one hour after sunset daily. (VC, ¶ 22). The park attracts thousands of visitors every year, who hike, bike, picnic, exercise, sightsee, as well as attend concerts and other events in the Amphitheatre. (VC, ¶¶ 25-26; Ex. A, ¶ 13).

### *Denver Public Forum Policy and its Impact on Red Rocks Park*

2

Denver's Arts and Venues division manages and operates the Amphitheatre, along with the McNichols Civic Center Building, the Colorado Convention Center, the Denver Coliseum, and the Denver Performing Arts Complex. (VC, ¶¶ 27-29). For these five venues, Denver developed and has maintained a public forum policy that regulates expressive activity in the spaces surrounding the venues. (VC, ¶ 30; Denver Public Forum Policy, attached to MPI as Ex. "C"). This policy declares the facilities and contiguous outdoor areas are not public forums for expressive activity, regardless of the nature of those areas. (VC, ¶ 31; Ex. C). In the abounding areas of the Amphitheatre, as well as the other venues, Denver bars all expressive activity, except for the discrete places it has designated as suitable for speech. (VC, ¶ 32; Ex. C). And, in these designated public forums, Denver conditions speech on speakers obtaining its or tenant's express written consent to conduct the activity. (VC, ¶ 33; Ex. C).

Denver's public forum policy, as applied to Red Rocks park, disallows expressive activities in the entire park except for 5 detached spots near intersecting public streets far from the Amphitheatre. (VC, ¶¶ 34-35; *see* Map of Designated Forum Areas in Red Rocks Mountain Park, per Denver Public Forum Policy, attached to MPI as Ex. "D"). None of the designated forums are apt for public expression because they lack significant pedestrian traffic. (VC, ¶ 36).

### Denver Bars Maldonado's Speech at Red Rocks Park through Public Forum Policy

Maldonado looks for opportunities to share his message on the open public sidewalks bordering the Upper North lot and Top Circle lot in Red Rocks park because these pathways offer a steady flow of pedestrian traffic for him. (VC, ¶¶ 37-38; Ex. A, ¶¶ 12-14). The Upper North lot and Top Circle lot are near each other and connect by staircase. (VC, ¶ 39; Photograph of sidewalk

staircase at Upper North Lot and sidewalk to Top Circle Lot, attached to MPI as Ex. "E";
Photograph of sidewalk in front of staircase between Upper North Lot and Top Circle Lot, attached
to MPI as Ex. "F"; *see* Photograph of western edge of sidewalk leading to staircase between Upper
North Lot and Top Circle Lot, attached to MPI as Ex. "G"; Photograph of eastern edge of sidewalk
leading to staircase between Upper North Lot and Top Circle Lot, attached to MPI as Ex. "H").
These lots are near site-seeing spots and hiking trails, one of which leads to a picnic shelter.  (VC,
¶ 39; *see* Ex. B; Photograph of sidewalk on southeast side of Upper North Lot, showing walking
path, attached to MPI as Ex. "I"; Photograph of southeast pathway leading to Upper North Lot,
attached to MPI as Ex. "J"; Photograph of Funicular Hiking Trail leading out from Upper North
Lot, attached to MPI as Ex. "K"; Photograph of Funicular Hiking Trail leading to Upper North
Lot, attached to MPI as Ex. "L").  The two lots are also used for parking during events at the
Amphitheatre.  (VC, ¶ 40).

The bordering sidewalks provide significant pedestrian traffic, especially on the days of
amphitheatre events.  (VC, ¶ 41; Ex. A, ¶¶ 13-14). Consequently, Maldonado has stood on these
sidewalks to share his faith prior to the start of amphitheatre events on several occasions and has
done so largely without issue.  (VC, ¶¶ 42-43; Ex. A, ¶¶ 15-16).  But he did run into problems on
April 18, 2019.

On this date, Maldonado, along with friends Adam Lacroix and Kerrigan Skelly, went to
the sidewalk bordering Top Circle lot to share his Christian faith with passersby who were
attending the Snoop Dogg concert in the Amphitheatre later that evening.  (VC, ¶¶ 44-45;
Photograph of southeast section of Top Circle Lot and adjacent sidewalk, attached to MPI as Ex.

"M"; Photograph of intersection of sidewalks at southeast section of Top Circle Lot, attached to MPI as Ex. "N"; Photograph of intersection of sidewalks at southeast section of Top Circle Lot, attached to MPI as Ex. "O").  Arriving at around 5 p.m., Maldonado stood out of the way of pedestrian traffic, peacefully displayed a sign, and addressed people who were walking on another sidewalk leading into the Amphitheatre.  (VC, ¶¶ 45-46).

Not long after they began sharing, Red Rocks park staff, Denver police officer Lt. Leger and other police officers, and an event staff manager, approached Maldonado and friends.  (VC, ¶ 47).  Lt. Leger greeted them, and directed them to leave the area, advising that the City Attorney's office established public forum areas in different places.  (VC, ¶¶ 48-49).  Maldonado inquired about the policy and the event staff manager, Mr. Juergens, showed him a map showing the 5 designated spots within Red Rocks park where speech is allowed.  (VC, ¶¶ 50-51).  Lt. Leger stressed to Maldonado that he and his friends could speak only in those spots.  (VC, ¶ 51).  Looking at the map, Maldonado knew none of the spots would be good for speech due to the lack of pedestrians in those places.  (VC, ¶¶ 52-53; Ex. A, ¶¶ 28-31; *see* Photograph of designated forum area 1, attached to MPI as Ex. "P"; Photograph of designated forum area 2 from across Hogback Road, attached to MPI as Ex. "Q"; Photograph of designated forum area 2, close-up, attached to MPI as Ex. "R"; Photograph of designated forum area 2a, facing south, to MPI as Ex. Exhibit "S"; Photograph of designated forum area 2a, facing north, to MPI as Ex. Exhibit "T"; Photograph of designated forum area 3 from across Bear Creek Road, attached to MPI as Ex. "U"; Photograph of designated forum area 3, close-up, attached to MPI as Ex. "V"; Photograph of designated forum

area 4, facing south, attached to MPI as Ex. "W"; Photograph of designated forum area 4, facing

north, attached to MPI as Ex. "X").

Concerned, Maldonado pointed out that Red Rocks park is a public park and that the policy

could not usurp his constitutional rights, but Lt. Leger was firm.  (VC, ¶¶ 54-55).  Maldonado's

friend Lacroix asked to see the policy limiting speech to the 5 spots, and Mr. Juergens soon emailed

the policy to him.  (VC, ¶¶ 56-57).  Maldonado pointed out that many people come to the parking

lots without going to the event, but Lt. Leger just reiterated that First Amendment activities are

limited to the 5 spots shown on the map.  (VC, ¶ 59).

Reviewing the policy, Lacroix observed that the policy addressed facilities, not Red Rocks

park, a public park, but Lt. Leger declined to engage in the matter, inviting Maldonado and friends

to take the issue up with the City Attorney.  (VC, ¶¶ 60-61).  Lt. Leger then asked if they were

willing to move to one of the designated spots.  (VC, ¶ 61).  Lacroix expressed reluctance because

the spots denied them an audience, but Lt. Leger warned that refusal to move would result in a

citation.  (VC, ¶ 62).  Lt. Leger reiterated that the policy was written by the City Attorney's office

and they must go to the areas designated if they wished to continue with their speech.  (VC, ¶ 63).

Lacroix asked about consequences for refusing to relocate, and Lt. Leger answered that he

would pursue a trespass charge against them.  (VC ¶ 64).  Maldonado's other friend Skelly queried

how they could trespass on public property; to which, Lt. Leger said he would issue them tickets

for refusing to comply and they could ask the court how it is so.  (VC, ¶¶ 64-66).  Skelly explained

he did not want to go to court, he just wanted to share the gospel without being forced to go to a

place where no people were located, but Lt. Leger reiterated that the relocation was mandated

under Denver's policy, and he needed to take his issue up with them. (VC, ¶¶ 67-69). Lt. Leger reminded that Red Rocks park is owned by the City in insisting that Maldonado and friends go to one of the designated spots to speak to avoid a ticket. (VC, ¶¶ 70-71). Maldonado and friends did not want to speak at the designated areas because they knew there would be no one in those places to hear their message. (VC, ¶ 72; Ex. A, ¶¶ 29, 39; *see* Exs. P through X). And neither wanting to receive a ticket, Maldonado and company gave up their speech and left the park. (VC, ¶ 73; Ex. A, ¶ 39).

### *Denver Persists in Barring Maldonado's Speech at Red Rocks Park*

Wanting to return to the sidewalks bordering Upper North lot and Top Circle lot in Red Rocks park to share his message, Maldonado subsequently called Denver's help center phone line to discuss the policy. (VC, ¶¶ 74-75; Ex. A, ¶¶ 40-42). The dispatcher advised that she was unaware of the policy but encouraged Maldonado to contact the City Attorney's office about the matter. (VC, ¶ 76). Following up on her as well as Lt. Leger's advice, in September of 2019, Maldonado's wife, Michelle Maldonado (neé Medina), called into the Denver City Attorney's office and later sent a copy of the public forum policy that was used to restrict Maldonado's speech, asking whether Denver maintained the referenced policy though it violates First Amendment rights. (VC, ¶¶ 77-79; Email from Michelle Maldonado to Marley Bordovsky, attached to MPI as Ex. "Y"). The following day, Tad Bowman, Venue Director for Red Rocks Amphitheatre, emailed a response to Michelle's inquiry, countering that the restrictions set out in the policy are constitutionally valid. (VC, ¶¶ 80-81; Email from Tad Bowman to Michelle Maldonado, attached to MPI as Ex. "Z").

Michelle shared the communications with Maldonado and he doubted of ever speaking there again. (VC, ¶ 82; Ex. A, ¶ 47). But, later on, Maldonado retained legal counsel to regain his rights. (VC, ¶¶ 83-84). Per this representation, on June 1, 2020, counsel sent a letter to Denver officials seeking relief from Denver's public forum policy banning Maldonado's expression in nearly all of the park. (VC, ¶ 85; Letter from Maldonado's counsel to Denver officials, attached to MPI as Ex. "AA"). The letter described the stoppage of Maldonado's speech, explained why Denver's public forum policy violated constitutional requirements, and sought written assurance that Denver no longer apply the policy to Maldonado's peaceful expression in traditional public forums in Red Rocks park. (VC, ¶¶ 86-87; Ex. AA). Denver replied via letter on July 7, 2020, rejecting Maldonado's request. (VC, ¶ 88; Letter from City of Denver officials to Maldonado's counsel with attachments, attached to MPI as Ex. "BB"). Denver claimed that no portion of Red Rocks park is a traditional public forum and insisted that its policy is constitutional, reaffirming the mandate that Maldonado only speak in one of the 5 designated spots. (VC, ¶¶ 89-90; Ex. BB). Given Denver's response and the corresponding threat of criminal sanction, Maldonado has not returned to speak in Red Rocks park since he was silenced on April 2019, missing numerous opportunities to share his gospel message. (VC, ¶ 91; Ex. A, ¶ 52).

Denver retains a public forum policy banning First Amendment activities everywhere in Red Rocks park except for 5 isolated, off-the-beaten-path spots. (VC, ¶ 92; Ex. C; Ex. D). By virtue of which, Denver prohibits Maldonado from engaging in any form of religious expression on sidewalks bordering the Upper North lot or Top Circle lot in the Red Rocks park. (VC, ¶ 93; *see* Ex. C; Ex. BB). Though Maldonado strongly desires to share his religious message on those

public sidewalks in that public park, he refrains for fear of criminal sanction, which causes him to suffer irreparable harm.  (VC, ¶¶ 94-96; Ex. A, ¶ 52).

## ARGUMENT

A preliminary injunction should be granted when the movant demonstrates "(1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest." *Verlo v. Martinez [Verlo I]*, 820 F.3d 1113, 1126 (10th Cir. 2016) (citation omitted).  Maldonado meets these requirements.

## I.    MALDONADO IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS

Free speech claims – like Maldonado's – are assessed through the lens of forum analysis contemplating A) whether the expressive activity is protected, B) the nature of the forum where the speaker wants to speak, and C) whether the government's justifications for restricting speech satisfy the applicable level of scrutiny.  *Verlo I*, 820 F.3d at 1128.  Denver's public forum policy banning First Amendment activities from public sidewalks (and virtually all other areas) within a public park falls far short of constitutional requirements.  Hence, Maldonado has a high likelihood of prevailing. *See Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 666 (2004) (where speech restriction fails scrutiny, movant challenging it "must be deemed likely to prevail").

### A.  Maldonado's Modes of Speech are Constitutionally Protected

Maldonado wants to convey his religious sentiments through literature, discourse, signs, and/or ordinary conversation.  The First Amendment to the U.S. Constitution covers his religious viewpoints.  *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995).  It

likewise offers broad protection for the various methods by which he expresses his ideas. Literature distribution and conversations are core First Amendment activities. *Verlo I*, 820 F.3d at 1128. Public oration of religious views is also contemplated. *See Edwards v. South Carolina*, 372 U.S. 229 (1963) ("religious harangue" protected). And "signs are a form of expression protected by the Free Speech Clause." *City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994). Maldonado's methods, as well as his message, deserve constitutional safeguarding.

**B. Red Rocks Park and Sidewalks are Traditional Public Fora**

Whether a speech restriction is proper depends on the forum where the speech is restricted. *Verlo I*, 820 F.3d at 1129. Three basic forum types exist: traditional, designated, and nonpublic fora. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc*., 473 U.S. 788, 802 (1985). Traditional public fora consist of ostensibly public places, namely, parks, streets, and sidewalks, places that are historically used for the free exchange of ideas. *Id*. at 800. Designated public fora are venues that are otherwise nonpublic fora but the government has opened up for expressive activity. *Id.* at 802. And a nonpublic fora are pieces of property owned by a government entity that have not been made public fora either by tradition or intentional designation. *Id.*

**1. Public park and the sidewalks in it are quintessential public fora**

Maldonado wants access to the public sidewalks within Red Rocks park, a public park, to speak his mind.[1] Public parks qualify as traditional public fora. *Eagon Through Eagon v. City of*

---

[1] Because Maldonado does not seek to speak in the amphitheatre itself or other restricted-access locations within the park, forum analysis does not involve these areas, just the areas where he wants to speak. *See Cornelius*, 473 U.S. at 801 (requiring a "more tailored approach" to forum analysis based on the access sought by the speaker).

*Elk City, Okl.*, 72 F.3d 1480, 1486 (10th Cir. 1996).  Similarly, sidewalks are "quintessential

[traditional] public forums." *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d

1212, 1219 (10th Cir. 2007) (citation and quotations marks omitted).

The traditional status assigned to these types of areas results from expectations the general

public has about the freedom to speak in them.  Such venues "have immemorially been held in

trust for the use of the public and, time out of mind, have been used for purposes of assembly,

communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307

U.S. 496, 515 (1939).  For this reason, no "particularized inquiry" into the precise characteristics

of a traditional public forum is needed to confirm its status. *Frisby v. Schultz*, 487 U.S. 474, 481

(1988).  The "historical-categorical approach" of automatically labelling parks and sidewalks, as

well as streets, as traditional public fora for speech purposes, is binding precedent. *Verlo v.

Martinez [Verlo II]*, 262 F.Supp.3d 1113, 1144-45 (D. Colo. 2017).  Therefore, Denver's attempt

to depict Red Rocks park or its sidewalks as anything other than traditional public fora is

unavailing.

### 2.  Denver cannot eliminate traditional public fora status through policy

In its public forum policy, and accompanying map, Denver decrees that only five secluded

spots – and neither of the sidewalks sought by Maldonado – are "public forums" within all Red

Rocks park.  But this is not for Denver to say.  Traditional public fora "are open for expressive

activity regardless of government's intent." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S.

666, 678 (1998).[2]   The government cannot declare the forum status of a given property by edict.
*First Unitarian Church of Salt Lake City v. Salt Lake City Corp*., 308 F.3d 1114, 1125 (10th Cir.
2002).  This determination is dictated by the property's objective characteristics.  *Id.*

As a consequence, no government entity (including Denver) is at liberty to transform a
traditional public forum into another type of forum.  *United States v. Grace*, 461 U.S. 171 (1983).
Public parks and sidewalks retain their traditional public fora status as long as they remain public
parks and sidewalks.  *See McGlone v. Bell*, 681 F.3d 718, 732-33 (6th Cir. 2012) (holding
university-owned sidewalks on perimeter of campus to be traditional public fora because they
retained characteristics of ordinary sidewalks); *Freedom from Religion Found., Inc. v. City of
Marshfield, Wis*., 203 F.3d 487, 494 (7th Cir. 2000) (holding park to be a traditional public forum
despite sale of a portion of it to a private entity because the entire park retained its character as a
public park). *Cf. Hawkins v. City and County of Denver*, 170 F.3d 1281, 1287 (10th Cir. 1999)
(held open-air complex connecting various art venues known as the "Galleria" was not a traditional
public forum because it was no longer a public street, remarking:  "The Galleria does not qualify
as a traditional public forum, for it is not a park, nor is it analogous to a public right of way or
thoroughfare").  Since Red Rocks Park and its sidewalks are true to their descriptors, they cannot
be downgraded to a lesser fora.

---

[2] If a government entity's whim could control, "there would be *no* traditional public forums."
*ACLU of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1102 (9th Cir. 2003) (emphasis in original).
Of course, the "principal purpose" of public streets, sidewalks, and parks is not expression, but
transportation, recreation, and beautification.  *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
505 U.S. 672, 697, (1992) (Kennedy, J., concurring).   These locations are still viewed –
categorically – as traditional public fora.  *Verlo II*, 262 F.Supp.3d at 1134; *see Frisby*, 487 U.S. at
480 (rejecting invitation to jettison categorical approach as "cliché").

In *Grace*, the Supreme Court held not even an Act of Congress pronouncing sidewalks bordering the Supreme Court building to be nonpublic fora could make them so.  *Id.*  Likewise, in *McMahon v. City of Panama City Beach*, a district court held an open field (called the "Festival Site") within a city-owned park a traditional public forum despite the City's expressed intention to make it a venue for privately-run events.  180 F.Supp.3d 1076, 1095 (N.D. Fla. 2016).  As the court aptly explained, "the City cannot build a park – the most quintessential traditional public forum – allow people to use it as a park, and then rely on some 'whereas' clauses in a development agreement to say that it's not really a park."  *Id.*  In the same way, Denver cannot eradicate the traditional public forum status inherent with Red Rocks Park and its sidewalks.

### 3.  Presence of nearby event does not affect traditional public fora status

Moreover, the sidewalks and other open areas within Red Rocks Park do not lose their traditional public forum status, even temporarily, because a ticketed event is occurring in the amphitheatre at the same time.

Courts have repeatedly held public parks maintain their traditional public forum status while they are being used for privately permitted events.  *See Eagon*, 72 F.3d at 1487 (holding public park remained a traditional public forum during "Christmas in the Park" event); *Johnson v. Minneapolis Park and Recreation Bd*., 729 F.3d 1094, 1098-99 (8th Cir. 2013) (public park remained traditional public forum while free and open festival was taking place in park).  It follows that a traditional public forum sitting outside an event venue cannot lose its status due to proximity to the ticketed event.  *See, e.g., McGlone v. Metro. Gov't of Nashville*, 749 F.App'x 402, 403 (6th Cir. 2018) (public sidewalks outside festival remained traditional public fora); *Deferio v. City of*

*Syracuse*, 193 F.Supp.3d 119, 127 (N.D.N.Y. 2016) (public sidewalk outside confines of festival recognized as traditional public forum).

During open hours, Red Rocks Park at large and its sidewalks are free and open to the public all year-round, including when events are transpiring in the amphitheatre. (VC, ¶¶ 22, 38; Ex. A, ¶ 14). No one need pay for admission or have a ticket to enter the park itself or stand on the sidewalks where Maldonado wants to be and speak. (VC, ¶¶ 22; Ex. A, ¶ 35). These public access sidewalks lie outside the barricades demarcating the boundaries of a limited-access area surrounding the amphitheatre. (VC, ¶ 46). They always remain free for general pedestrian passage and access, and thus, remain traditional public fora.

### C. Denver's Speech-Restrictive Policy is Unconstitutional

The traditional public forum status assigned to the park and sidewalks is no small matter. "[M]embers of the public retain strong free speech rights when they venture into public streets and parks." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009)). Thus, in this type of fora, the government's capacity to restrict expressive activity is severely limited. *Eagon*, 72 F.3d at 1486 (citation omitted). Speech restrictions in these places are not constitutional unless they are content-neutral, narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *Eagon*, 72 F.3d at 1487.

Denver's "public forum" policy bans all expressive activities from all Red Rocks Park except for a few remote locations. (Ex. C; Ex. D). Its extraordinarily restrictive scheme cannot satisfy First Amendment scrutiny, particularly, as required in traditional public fora. Also, the

14

policy is unconstitutionally vague, as it fails to give Maldonado or anyone else fair warning of criminal sanction for engaging in protected expression in public fora.

### 1. Not Narrowly Tailored to Significant Government Interest

Denver's broad, flat ban on all expressive activities throughout 99.998 %[3] of Red Rocks Park is far too restrictive to be narrowly tailored by any conceivable measure.

To be valid, a restriction cannot burden "substantially more speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). Denver, in categorically banning First Amendment activities from the vast majority of Red Rocks Park, prevents any way a person conveys ideas, unhitching its restriction from any conceivable interest Denver might have for it. This extreme imposition on expression is surely not necessary.

"[T]he government may not prohibit all communicative activity." *Perry Educ. Ass'n v. Perry Local Eductor's Ass'n*, 460 U.S. 37, 45 (1983). This is what Denver does with its ban on First Amendment activities. *In First Unitarian Church*, the Tenth Circuit struck down a ban of similar breadth, having the effect of eliminating virtually all expression in a traditional public forum. 308 F.3d at 1132. The Supreme Court, in the same way, condemned a ban on "First Amendment activities" in an airport, finding it "obvious that such a ban cannot be justified even if [the airport] were a nonpublic forum because no conceivable governmental interest would justify

---

[3] Assuming each of the 5 speech zones covers 156.25 square feet (a 12.5' x 12.5' square), the total free speech area in the park is 781.25 square feet, an area comprising just 0.00207% of Red Rocks park's 37,810,080 total square feet.

such an absolute prohibition of speech." *Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 575 (1987).

The overbearing effect of Denver's policy is underscored by the harmlessness of the speech it restricts. Among all other forms of communication, the policy prohibits Maldonado from handing out literature. (Ex. C; *see* Ex. BB). Maldonado is free to stand, but as soon as he hands a piece of paper to a willing recipient, he is subject to criminal sanction. (Ex. C). As the Supreme Court has held, literature distribution is such an innocuous activity it must be allowed regardless of forum status. *Lee v. Int'l Soc'y for Krishna Consciousness, Inc.*, 505 U.S. 830 (1992).

Denver's broad-brush approach in exorcizing all First Amendment activities from virtually all Red Rocks Park is not remotely tailored to any legitimate interest. It is overly broad and unconstitutional.

### 2.  No Ample Alternatives for Maldonado's Message

Aside from the narrow tailoring requirement, speech restrictions must also leave ample alternative channels of communication to satisfy the First Amendment standards. *Perry Educ. Ass'n*, 460 U.S. at 45; *see iMatter Utah v. Njord*, 774 F.3d 1258, 1267 (10th Cir. 2014) (intermediate scrutiny requirements are conjunctive). This requirement ensures a speaker will have an adequate opportunity to gain his audience's attention and convey the intended message to them. *See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 655 (1981) (First Amendment protects opportunity to win attention); *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 866 (9th Cir. 2001) (alternatives are ample only if the speaker's intended message can reach his audience).

Denver's policy does not leave ample alternatives for the message.  In the vast majority of Red Rocks Park, including its public sidewalks, Maldonado is prohibited from communicating by any method imaginable.  The only alternatives left for Maldonado is to go to one of the few, remote designated areas (and comply with additional restrictions once there) or leave the park entirely. (Ex. C; Ex. D).  These proffered options are not viable.  It is legally inappropriate to ban expression in "appropriate places [] on the plea that it may be exercised in some other place."  *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939).  Moreover, these particular "alternatives" are demonstrably inadequate, depriving Maldonado of the audience he is trying to reach.  *See Mahoney v. Babbitt*, 105 F.3d 1452, 1459 (D.C. Cir. 1997) (explaining "it cannot rightly be said that all [] forums are equal.").  He specifically wants to address individuals going to events at the amphitheatre and he cannot reach this audience from the places is he forced to go.  (VC, ¶¶ 37, 74; Ex. A, ¶¶ 12-14, 29; *see* Ex. D).  All designated speech areas are thousands of feet from the amphitheatre and offer no pedestrian traffic with whom Maldonado can convey a message.  (Ex. A, ¶¶ 29-31; Ex. D; *see* Exs. P through X).  His message is effectivity squelched.  *See Amnesty Int'l, USA v. Battle*, 559 F.3d 1170 (11th Cir. 2009) (holding separating speakers from audience by 50 to 75 yards failed to leave ample alternatives); *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990) (holding leafletting and demonstrations at entrance of pier were not ample alternatives because their audience was inaccessible from that location).

The only adequate option for Maldonado to reach his audience is to communicate on the sidewalks and ways near the amphitheatre, where pedestrians are found.  (Ex. A, ¶¶ 12-14; *see* Ex.

G; Ex. H; Ex. N). Denver's policy forecloses this speech, leaving no viable alternative for Maldonado's message.

### 3. Public Forum Policy and Enforcement of it are Vague

In addition to violating Maldonado's right to free speech, Denver's policy and enforcement of it are vague in violation of due process. Due process in the Fourteenth Amendment demands citizens be given fair notice of what conduct is prohibited to prevent officials from enforcing restrictions in an arbitrary and discriminatory manner. *Grayned*, 408 U.S. at 108-09. The requisite clarity is amplified when free speech rights are affected. *Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 499 (1982).

Denver's policy and enforcement of it fail to provide fair notice of wrongdoing. Maldonado does not want to engage in anything illegal. He wants to share his views on public sidewalks in in a public park, areas which he rightly perceives as appropriate for free speech. Neither Maldonado nor anyone else could guess that harmless First Amendment activities are prohibited and exiled to remote spots thousands of feet away from the audience he seeks.

The public forum policy is not clear. It identifies "facilities," including "Red Rocks Amphitheatre and Visitor Center" as being subject to the policy, but, in application, it applies the policy to all of Red Rocks Park outside of five remote spots, in declaring a vast majority of the public park closed to free speech. (Ex. C). If anything, the description of the amphitheatre as being "located in Red Rocks Park" suggests that other areas of the park are public forums as they would be under normal circumstances. (*See* Ex. C). Moreover, the flat ban on "public forum activities" is less than clear, failing to notify what activity is prohibited by the policy. *See City of*

*Chicago v. Morales*, 527 U.S. 41, 57-60 (199) (ordinance criminalizing "loitering" held vague because it was unclear what kind of loitering was prohibited and what was permitted).  By its terms, it encompasses any possible form of expression, and, indeed, is applied in such blanket fashion against Maldonado and his colleagues, and yet, in practice, Denver allows passersby to engage in various forms of expression, conversations, talking on cell phones, wearing expressive clothing, and the like.  The enforcement appears to turn on the content of the expression, without any criteria to go on, begging question of which expression the policy prohibits.

Lacking a general understanding, Denver's public forum policy fails to provide fair notice and breeds arbitrary and discriminatory enforcement.  It is unconstitutionally vague and violates due process.

## II.  MALDONADO IS SUFFERING IRREPARABLE HARM

Denver's unconstitutional public forum policy presently prohibits Maldonado from communicating by any means in locations where he has reasonable access to a meaningful audience – the sidewalks and ways within Red Rocks Park.  Maldonado greatly wishes to return to these locations and share his religious viewpoints, but Denver's extreme ban and threat of criminal sanction deters him from doing so.  (Ex. A, ¶ 52).  This "'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Verlo I*, 820 F.3d at 1126 (citation omitted).

## III.  BALANCE OF EQUITIES FAVORS GRANTING PRELIMINARY INJUNCTION

The balance of harms also favors granting preliminary injunction to Maldonado.  In halting the ongoing violation of Maldonado's constitutional rights, the requested injunction will cause no

harm to Denver.  Denver will remain free to enforce proper measures to protect whatever interests

it might have.  But it has no legitimate interest in banning First Amendment activities throughout

the vast majority of a wide-open public park. *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d

1114, 1145 (10th Cir. 2013) (holding that when a law is likely unconstitutional, the government's

interests do not outweigh a plaintiff's interest in the protection of his constitutional rights).

**IV.    PRELIMINARY INJUNCTION SERVES BEST INTEREST OF THE PUBLIC**

"'Vindicating First Amendment freedoms is clearly in the public interest.'"  *Verlo I*, 820

F.3d at 1127 (citation omitted).  Maldonado's requested injunction serves the best interest of the

public, offering protection to free speech in a public park.

## CONCLUSION

For the reasons set out herein, Maldonado respectfully requests that this Court grant his

Motion for Preliminary Injunction.

Respectfully submitted this 21st day of October, 2020.

s/Nathan W. Kellum
NATHAN W. KELLUM
MS BAR # 8813
Center for Religious Expression
699 Oakleaf Office Lane, Suite 107
Memphis, TN  38117
(901) 684-5485 – Telephone
(901) 684-5499 – Fax

Attorney for Plaintiff Joseph Maldonado

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing, along with the Complaint and Summons, has been/will be delivered to a process server for service on below-listed defendants, this 21st day of October, 2020:

City and County of Denver
Attorney: Kristin M. Bronson
Mayor's Office
1437 N. Bannock St., Room 350
Denver, CO 80202
(720) 913-3100
Kristin.Bronson@denvergov.org


Edward Leger
Attorney: Kristin M. Bronson
Police Administration Building
1331 Cherokee Street
Denver, CO 80204
(720) 913-3100
Kristin.Bronson@denvergov.org

<u>/s/ Nathan W. Kellum</u>
NATHAN W. KELLUM
Center for Religious Expression
699 Oakleaf Office Lane, Suite 107
Memphis, TN  38117
Telephone: (901) 684-5485
Fax: (901) 684-5499
Email: nkellum@crelaw.org
Attorney for Plaintiff Joseph Maldonado