IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 1:20-cv-03098-RBJ

JOSEPH MALDONADO,

Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO and
EDWARD LEGER, individually and as Police Lieutenant with City and County of Denver Police Department,

Defendants.

---

**ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

---

Plaintiff Joseph Maldonado wants to preach the gospel at Red Rocks park. Defendant, the City and County of Denver ("Denver"), has a policy that prevents him from doing so in his preferred locations. Maldonado seeks an order declaring Denver's policy unconstitutional. In the pending motion [ECF No. 12], he requests a preliminary injunction under Fed. R. Civ. P. 65(a) against Denver and its agents enjoining them from enforcing the policy. For the following reasons, the motion is DENIED IN PART and GRANTED IN PART.

# I. FACTUAL BACKGROUND

## A. Red Rocks

Red Rocks Amphitheatre (the "Amphitheatre") is a world-renowned open-air amphitheater situated between giant sandstone outcroppings west of Denver. It is used as a venue for individuals, entities, and organizations to rent for special events such as musical

concerts, performances, weddings, graduations, and exercise classes. Denver's Division of Arts and Venues operates and manages the Amphitheater.

The Amphitheater sits within Red Rocks Park, a free mountain park owned by Denver that covers 868 acres on the eastern slope of the Rocky Mountains. The Amphitheater is the "showpiece" of the park. This lawsuit concerns three areas of Red Rocks Park: the Top Circle Lot, the Upper North Lot, and the Staircase connecting the two lots. Those places are highlighted on the map of Red Rocks Park below:

DENVER MOUNTAIN PARKS
Matthews/Winters Park
(Jefferson County Open Space)
Morrison Slide Trail
Red Rocks Trail
W. Alameda Parkway
Entrance 1
70
Entrance 2
Geologic Marker
Geologic Overlook
Plains View Rd
Red Rocks Trail Rd
Mount Morrison Elev. 7,881 ft
Area Closed
Red Rocks Park
(Denver Mountain Park)
Tunnel
Lower North Lot
Upper North Lot
Top Circle Lot
Box Office
93
Seven Ladders Rock
Creation Rock
Red Rocks Amphitheatre
Red Rocks Park Rd
Visitor Center & Ship Rock Grille
Ship Rock
Trading Post Rd
Trading Post
Upper South Lot
Nine Parks Rock
Picnic Rock
Lower South Lot 1
Lower South Lot 2
Trading Post Trail
Frog Rock
Ship Rock Rd
Red Rocks Park Rd
Red Rocks Park
Stay on Designated Trails. No Off-Trail Use.
Rock Climbing Prohibited.
Park Entrance
Restroom
Parking
Trailhead
Picnic Shelter
Gift Shop
Restaurant
Rocks
Red Rocks Park Boundary
Jefferson Co. Open Space
Designated Trails
100 ft Contours
0 250 500 1,000 Feet
1 inch = 500 feet
Entrance 3
Entrance 4
74
Morrison Park
Bear Creek
Mount Falcon Park
Denver
Red Rocks Park

Since 1998, Arts and Venues has had a policy prohibiting public forum activities at its portfolio of assembly facilities, which include the Amphitheatre, its Visitor Center and other Denver arts venues such as the Denver Performing Arts Complex ("DPAC") and the Denver Coliseum (the "Policy"). The current version of the Policy was formalized in 2007 into a written Policy Statement. It declares that "[t]he City's public assembly facilities, including without limitation any associated parking lots, parking garages and outdoor assembly areas adjacent to the facilities, are reserved for the exclusive use of tenants and their invitees, and therefore the City's public assembly facilities are not public forums for expressive activities by members of the general public." ECF No. 16-2 at p.1. The Policy gives examples of "expressive activity" which include "demonstrations, picketing, leafleting, etc." *Id.* at p.2.

However, because Denver "recognizes and respects the need for areas for public expression adjacent to its public assembly facilities," it has designated five areas in Red Rocks Park as public fora open to all expressive activities. *Id.* The below map shows these areas:



The reason for the present case is that the five designated areas are not in areas of pedestrian traffic. Plaintiff states that his preaching goes unheard if he can only preach to cars driving by, typically with the windows shut and the drivers, at least, paying attention to the road and looking for entryways and parking areas. Essentially, plaintiff argues that Denver has acknowledged his right to preach but then has effectively retracted that acknowledgement by restricting him to places where no one can listen.

**B. The Plaintiff**

Plaintiff in this case is a Colorado resident and devout Christian. He regularly evangelizes by handing out literature with a Christian message, preaching, displaying signs, and engaging individuals in one-on-one conversations. He wants to share his message on the

sidewalks abutting the Top Circle Lot and the Upper North Lot before and during ticketed events at the Amphitheater. At those times, the two lots are full of eventgoers. Plaintiff has evangelized at these locations on a few occasions without incident.

On April 18, 2019, plaintiff and his companions were proselytizing on the sidewalk encircling the Top Circle Lot where attendees of a Snoop Dogg concert were waiting in line for security. Red Rocks Park staff and a Denver police officer told Maldonado and his friends to leave, citing Denver's Policy. After a back-and-forth, Maldonado left rather than risk a trespassing charge. He challenged Denver's Policy to city officials, but the City Attorney's office sent him a letter claiming the Policy is constitutional. Maldonado decided not to return to Red Rocks Park while the Policy remains in force for fear of criminal sanction. He brought this lawsuit seeking a preliminary injunction to prevent Denver from enforcing its Policy in Red Rocks Park.

## II.   LEGAL ANALYSIS

At oral argument Denver clarified that it did not oppose a preliminary injunction for the majority of Red Rocks Park. It only defends Denver's Policy as applied to three places: the Top Circle Lot, the Upper North Lot, and the staircase connecting the two lots. I therefore grant the preliminary injunction for the remainder of Red Rocks Park, excluding these three locations and the Amphitheater. I next analyze the parties' arguments concerning a preliminary injunction for the Top Circle Lot, Upper North Lot, and staircase connecting the two lots.

To obtain a preliminary injunction, plaintiff must demonstrate: "(1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the

preliminary injunction is in the public interest." *Republican Party of N.M. v. King*, 741 F.3d 1089, 1092 (10th Cir.2013).

**C. Likelihood of Success on the Merits**

This Court applies a three-step inquiry to decide whether the government violated a plaintiff's First Amendment rights. *Verlo v. Martinez*, 820 F.3d 1113, 1128 (10th Cir. 2016). Plaintiff must first establish that his activities were protected by the First Amendment. *Id.* If they were, I must "identify whether the challenged restrictions impact a public or nonpublic forum, because that determination dictates the extent to which the government can restrict First Amendment activities within the forum." *Id.* Finally, I apply the requisite standard of review to the government's proffered justification for prohibiting plaintiff's speech. *Id.*

Plaintiff has established that his activities were protected by the First Amendment. As both the Supreme Court and the Tenth Circuit recently confirmed, "pamphleteering and one-on-one communications are First-Amendment-protected activities." *Id.* In fact, "[n]o form of speech is entitled to greater constitutional protection." *McIntyre v. Ohio Elections Comm'n*, 514 U. S. 334, 347 (1995). Maldonado seeks to hand out literature, engage individuals in one-on-one conversations, preach, and hold signs. These activities are protected by the First Amendment.

Next, I must determine whether each of the three relevant locations is a traditional public forum, designated public forum, or nonpublic forum and apply the appropriate level of scrutiny to the government's proffered justifications for restricting plaintiff's speech. This analysis differs for each location. *See Verlo*, 820 F.3d at 1129.

1. The Top Circle Lot

Because plaintiff seeks to evangelize during ticketed events at the Amphitheater, the relevant forum to be analyzed is "the Top Circle Lot during ticketed events." *See Eagon v. City*

*of Elk City, Okl.*, 72 F.3d 1480, 1485 (10th Cir. 1996) (affirming a district court decision that analyzed whether "Ackley park during the 'Christmas in the Park' event is a public forum"); *McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076, 1094 (N.D. Fla. 2016) ("[T]he relevant forum is the limited portion of the Frank Brown Park Festival Site at which and during the time that Thunder Beach [an event] is held.").

Plaintiff argues that the Top Circle Lot is presumptively a public forum because it is part of Red Rocks *Park*. They cite *Eagon v. City of Elk City, Okl.*, a Tenth Circuit case holding that "city parks are quintessential public forums." 72 F.3d at 1486 (internal quotations omitted); *see* ECF No. 12 at p.7. Defendant responds that the title "park" is not dispositive. Instead, defendant asks this Court to ask whether a place "ha[s] immemorially been held in trust for the use of the public and, time out of mind, ha[s] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515 (1939). They argue that the areas immediately surrounding the Amphitheater have historically been used as a venue rented out to paying patrons. ECF No. 16 at p.6–7.

Defendant's arguments about the history of Red Rocks Park are unpersuasive. The relevant historical inquiry is whether the *type* of place at issue has historically been used as a place of public assembly and debate, not whether there is in-fact a long history of a *particular* place being used for such gatherings. A newly created lawn/park in front of a state capitol building would not avoid being designated a traditional public forum because it has no history of

actual assembly.  Defendants do not contest that Red Rocks Park is the type of park used for public assembly, so I accept that premise. [1]

However, this does not end the inquiry.  The government may close a public forum by, for example, changing its physical characteristics or principal use.  *Hawkins v. City & Cty. of Denver*, 170 F.3d 1281, 1287 (10th Cir. 1999); *see also Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 677 (1992) (Kennedy, J., concurring) ("In some sense the government always retains authority to close a public forum, by selling the property, changing its physical character, or changing its principal use.  Otherwise, the State would be prohibited from closing a park, or eliminating a street or sidewalk.").  I find that the Top Circle Lot during ticketed events was closed and is not a public forum.

In *Hawkins v. City and County of Denver*, the Tenth Circuit held that Denver's public assembly facility free speech policy — the same Policy at issue in this case — did not violate musicians' First Amendment rights when it prevented them from distributing leaflets in the DPAC Galleria.  170 F.3d at 1284.  The Galleria was "an open air, glass-covered pedestrian walkway" that was "formerly a public street."  *Id.* at 1284.  The court found that that the Galleria was not a traditional public forum because it "[did] not form part of Denver's automotive, bicycle

---

[1] At oral argument, defendant alluded to a claim that Red Rocks Park is not a traditional public forum because it is used for hiking and enjoying the natural environment.  Defendant cited *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508 (D.C. Cir. 2010), a D.C. Circuit case indicating that "many national parks include areas — even large areas, such as a vast wilderness preserve — which never have been dedicated to free expression and public assembly, would be clearly incompatible with such use, and would therefore be classified as nonpublic forums."  *Id.* at 515.  Defendant suggested that Red Rocks Park may be more akin to a wilderness area incompatible with public assembly than a municipal park like Civic Center Park across from the Colorado State Capitol.  The *Boardley* court, however, made clear that the nature of a park "is a fact-intensive question which cannot be answered in the absence of evidentiary submissions."  *Id.*  Defendant did not put sufficient facts in the record for me to decide today whether Red Rocks Park is more wilderness than civic center.  Therefore, I accept for now the parties' assumption that Red Rocks Park is the type of park that could be used for public assembly and debate.

or pedestrian transportation grid," and because it was not used "as a throughway to another destination." *Id.* at 1287. Instead, its function was "simply to permit ingress to and egress from the DPAC." *Id.*

*Hawkins* contrasts with a Supreme Court case, *United States v. Grace*, 461 U.S. 171 (1983), in which the Court ruled that sidewalks surrounding the Supreme Court building in Washington, D.C. were a public forum. *Id.* at 178–79. The Court emphasized an absence of any differentiation from normal sidewalks. It found that while the government had the power to make sidewalks nonpublic forums, in this case the sidewalks contained "no separation, no fence, and no indication whatsoever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave." *Id.* at 180.

The Top Circle Lot during ticketed events is like the Galleria in *Hawkins* and unlike the sidewalk in *Grace*. It is not a "thoroughfare" or central part of the transportation grid. *See Hawkins*, 170 F.3d at 1287. Its sole purpose is permitting ingress and egress to the Amphitheater's ticketed events — it is a drop-off point for busses, a lot for valet parking, a pedestrian gathering area for security screening lines, a parking area for individuals with disabilities, and an access point for medical and emergency services. And unlike the sidewalks in *Grace*, the Top Circle Lot during ticketed events is physically marked off. A sign at the entrance clearly indicates that the lot is for handicapped accessible parking only.

Nor does the Top Circle Lot during ticketed events fit the description of a designated public forum. A designated public forum is government property that, although not a traditional public forum, is "intentionally opened up for that purpose." *Verlo*, 820 F.3d at 1141 (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)). To create a designated public

forum, "the government must make an affirmative choice to open up its property for use as a public forum." *Id.* (quoting *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 206 (2003)). "[A] regulation prohibiting disruption, and a practice of allowing some speech activities on [a government] property do not add up to the dedication of [such] property to speech activities." *United States v. Kokinda*, 497 US 720, 730 (1990).

I see no "affirmative choice" by Denver to open the Top Circle Lot as a public forum during ticketed events. To the contrary, Denver affirmatively closes the Top Circle Lot to all but invited guests during ticketed events. The fact that Denver may have occasionally permitted plaintiff to leaflet does not mean that the city has dedicated the Top Circle Lot during ticketed events for that use. *See Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802 (1985) ("The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse.").

Because the Top Circle Lot during ticketed events does not constitute a public forum either by tradition or by designation, it is a nonpublic forum. To pass muster, then, Denver's policy as applied to the forum need only be viewpoint-neutral and reasonable in light of the forum's purpose.

Plaintiff has not shown a substantial likelihood that Denver applied its policy to plaintiff on the basis of his viewpoint. Plaintiff's motion asserts without factual analysis that Denver's enforcement "appears to turn on the content of the expression." ECF No. 12 at p.13. Plaintiff clarified his position at oral argument: he argued that Denver confronted only Mr. Maldonado, who was preaching a religious message, and not those chit-chatting while waiting in line or tailgating before the concert. This argument borders on frivolous. Tailgaters and line-standers, who presumably hold tickets to the event, are "invitees" within the meaning of Denver's policy

and not subject to the ban on expressive activities. *See* ECF No. 16-2 at p.1 (The City's public assemblies, including without limitation any associated parking lots, . . . are reserved for the exclusive use of tenants and their invitees, and . . . are not public forums for expressive activities by members of the general public.").[2] Denver's Policy is viewpoint-neutral.

Denver's refusal to allow plaintiff to proselytize in the Top Circle Lot during ticketed events is also reasonable. The record shows that, during ticketed events, the Top Circle Lot is used as a drop-off spot, a handicapped-accessible parking lot, an area for eventgoers to wait in line for security and ticketing, and an access point for medical and emergency services. Defendant presented evidence about the logistical difficulties and dangers associated with moving tens of thousands of pedestrians in and out of an alpine amphitheater. Plaintiff wishes to preach, distribute leaflets, and engage individuals in one-on-one conversations. Although plaintiff's activities have not yet caused disruption, "the Government need not wait until havoc is wreaked to restrict access to a nonpublic forum." *Hawkins*, 170 F.3d at 1290 (quoting *Cornelius*, 473 U.S. at 810). The Tenth Circuit has found that activities like leafletting can disrupt the flow of pedestrian traffic in a number of ways. *Id.* at 1291. Leafleteers standing in walkways could disrupt traffic. *Id.* Patrons wishing to avoid evangelizers could change their route. *Id.* Patrons might further obstruct traffic flow by stopping to engage individuals like plaintiff. *Id.* This last concern is particularly acute in this case where, as plaintiff testified, his preaching not infrequently results in combative or even violent altercations with passersby. The risk of

---

[2] A cursory reading of the policy also undermines plaintiff's other due process claim. The policy is not unconstitutionally vague, as plaintiff asserts. *See* ECF No. 16 at p.12–13. The policy specifically indicates that impermissible "expressive activities," which it also calls "public forum activities," include "demonstrations, picketing, leafleting, etc." ECF No. 16-2 at p.2. Ordinary people reading this policy can understand which conduct is prohibited. *See Dias v. City and Cnty. of Denver*, 567 F.3d 1169, 1179 (10th Cir. 2009).

congestion presents efficiency and safety concerns, especially as the Top Circle Lot is the access point for medical and emergency services. Denver's enforcement of its policy is reasonable.

Because the Top Circle Lot during ticketed events is a nonpublic forum and Denver's enforcement of its Policy there is viewpoint-neutral and reasonable, plaintiff has not shown a substantial likelihood of success on the merits for this area. I deny plaintiff's motion for a preliminary injunction as it relates to the Top Circle Lot.

2. Staircase Between Upper North Lot and Top Circle Lot

I find that the staircase (meaning the stairs themselves and surrounding property where plaintiff could preach to people climbing the stairs) during ticketed events is a nonpublic forum. Staircases have not "immemorially been held in trust for the use of the public and . . . used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague*, 307 U.S. at 515. Moreover, the sole purpose of this staircase is to provide access to the Top Circle Lot and the Amphitheater.

In *United States v. Kokinda*, the Supreme Court held that a sidewalk leading to a post office was a nonpublic forum. 497 U.S. at 730. The Court found that the sidewalk was not a "thoroughfare. Rather, it [led] only from the parking area to the front door of the post office . . . [and] was constructed solely to provide for the passage of individuals engaged in postal business." *Id.* at 727.

Here, the staircase in question shares relevant characteristics with the *Kokinda* postal sidewalk. It is not a thoroughfare. It leads only from a parking area to the Top Circle Lot and the Amphitheater, two nonpublic fora. Its sole purpose during ticketed events is to provide for the passage of individuals to these nonpublic fora. It is a nonpublic forum.

Denver's policy as applied to plaintiff on the staircase is viewpoint-neutral for the reasons described above.

Denver's policy is also reasonable for substantially similar reasons. Although Denver's concerns about medical and handicapped accessibility do not apply to the staircase, its concerns about not impeding pedestrian flow are amplified on a staircase where obstruction could lead to stumbles, and stumbles could lead to dangerous falls.

3. Upper North Lot

Patrons leaving the Upper North Lot can either walk to the staircase leading to the Top Circle Lot and security check point or take one of two paths leading west from the Upper North Lot to a different parking lot or entry way. When I refer to the Upper North Lot, I mean the sidewalks and areas adjacent to the lot through which pedestrian traffic flows, including the beginning of the westward paths.

Based on the record before me, I find that the Upper North Lot, so defined, is probably a traditional public forum even during ticketed events. I again begin from the presumption that Red Rocks Park is the type of park traditionally used for assembly and public debate. *But see supra* p.9, n.1. Denver does not close the Upper North Lot to the general public during ticketed events. The Upper North Lot, unlike the Top Circle Lot, does not have a sign indicating that it may only be used for event parking. Nor is it closed to pedestrians other than event patrons — a walking trail terminating at the lot remains open before and during ticketed events (while the park is open). The Upper North Lot contains "no separation, no fence, and no indication whatever to persons" entering the lot "that they have entered some special type of enclave." *Grace*, 461 U.S. at 180.

Therefore, I turn to whether the restriction prohibiting expressive activities at this location are content-based or content-neutral. Content-based speech restrictions "must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." *Verlo*, 820 F.3d at 1134 (quoting *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009)). Content-neutral restrictions are permissible if they "(a) serve a significant government interest; (b) are narrowly tailored to advance that interest; and (c) leave open ample alternative channels of communication." *Id.* Both type of restrictions require a compelling government interest. Denver's policy is content-neutral for the same reasons it is viewpoint-neutral.

Finally, there is no evidence in the record of a compelling government interest in prohibiting expressive activities in this location, the vicinity of the Upper North Lot, so long as it does not occur near the staircase leading to the Top Circle Lot. Denver's only articulated interest regarding the Upper North Lot was the efficient movement of pedestrians in and out of the Amphitheater. If Denver defends its Policy "as a means to redress past harms or prevent anticipated harms," it must "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994). It has not done so here. It did not present testimony about the Upper North Lot's role in ingress to and egress from the amphitheater, unlike its testimony regarding the Top Circle Lot's importance as a staging area for security, entrance for disabled individuals, and access point for emergency services. Nor has Denver shown that permitting evangelizing would impede pedestrian flow into the Amphitheater in a way that its current policy, which permits general access to the lot for non-eventgoers, does not. Absent a more thorough explanation of the government's interest in the Upper North Lot, I find

it unlikely that there is an existence of a compelling government interest in preventing evangelizing in this lot.

I therefore find that plaintiff is likely to succeed on the merits of his First Amendment claim as it pertains to the Upper North Lot unless evidence presented at the permanent injunction hearing indicates that Red Rocks Park is not a traditional public form or that Denver has a compelling governmental interest in prohibiting plaintiff's activities at the Upper North Lot.

**D. Irreparable Harm**

Defendant agrees that plaintiff has shown irreparable harm if he establishes a likelihood of success on his First Amendment claim. *See* ECF No. 16 at p.13–14. Because I believe plaintiff has carried this burden as it applied to the Upper North Lot, I find that plaintiff has established irreparable harm. *See Verlo*, 820 F.3d at 1127 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))).

**E. Balance of Equities**

This factor weighs in plaintiff's favor. Plaintiff testified that without access to the Upper North Lot he would be unable to convey his message to a sufficiently large audience. The five areas that Denver has designated for expressive activities are not located in places where there is much, if any, pedestrian traffic during Amphitheatre events. Denver claims "a strong interest in preserving the Amphitheatre and its immediate surrounding areas for their intended use as a revenue-generating arts venue and ensuring that patrons have safe and efficient ingress and egress to the Amphitheatre during events." ECF No. 16 at p.14. But Denver has not shown that plaintiff's activity would impair Denver's ability to use the Amphitheater as a revenue-generating arts venue, nor has it shown any safety concerns with plaintiff's activities in the

Upper North Lot. Denver's only concern supported by the record is efficiency. I find that the equities prefer vindicating constitutional rights over maximizing efficiency.

### F. Public Interest

I assume that many, perhaps most, people who buy tickets for an event at the Amphitheatre are not particularly interested in being proselytized to by Mr. Maldonado or anyone else as they leave their cars and walk toward the event. But that practical reality does not trump the constitutional issue. Denver has not offered any alternative location where the plaintiff could share his message with pedestrians. Therefore, assuming that the Upper North Lot is a traditional public forum, there is a substantial likelihood that applying Denver's current policy to that location would impair plaintiff's constitutional rights. Therefore, I find that the public interest would be furthered by this preliminary injunction. *See Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005) ("Vindicating First Amendment freedoms is clearly in the public interest.").

## III. ORDER

The Plaintiff's motion for a preliminary injunction, ECF No. 12, is granted in part and denied in part as follows:

1. A preliminary injunction is DENIED as to the Top Circle Lot and the staircase connecting the Top Circle Lot to the Upper North Lot.
2. A preliminary injunction is GRANTED as to the location near the Upper North Lot described in this order. Until the matter is finally addressed and resolved at a permanent injunction hearing, plaintiff may engage in his expressive activities in that location.

3. The unopposed request for a preliminary injunction is GRANTED for the remainder of Red Rocks Park.

Dated this 5th day of October, 2021.

BY THE COURT:

R. Brooke Jackson
United States District Judge